**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 4, 2018**

# In the Court of Appeals of Georgia

A18A1408. MCCLENDON v. THE STATE.
A18A1409. GLOVER v. THE STATE.

BROWN, Judge.

Johnny McClendon and Georgio Glover were jointly indicted and tried on two charges each of felony murder and aggravated assault and one charge each of murder, conspiracy to commit murder, participation in criminal street gang activity, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. The charges arose out of a confrontation that occurred on April 9, 2013, in Atlanta, Georgia. Garrett Dunlap and Mautious Wise were shot during the incident, and Dunlap's injuries were fatal. The jury convicted McClendon and Glover on the charge of participation in criminal street gang activity, but acquitted them of the remaining charges. Following their convictions, both Glover

and McClendon moved for new trials on several grounds, including the ones alleged on appeal. The trial court denied their respective motions, and both men appeal, alleging that (1) the State failed to disclose evidence of payments made to or on behalf of a witness in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), and (2) the trial court erred by rejecting their claims under *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986), that the State exercised its peremptory strikes in a racially discriminatory manner during jury selection. Because both cases arise from the same facts, involve a joint trial and joint motion hearings, and the men raise identical issues on appeal, we have consolidated their cases for review. For the reasons set forth below, we reverse in both cases.

The evidence presented at trial showed that on April 9, 2013, Dunlap and Wise were shot at an apartment complex on Delmar Lane in an area of the City of Atlanta known as "the Nine." Dunlap died at the scene, and Wise was injured and taken to the hospital. There was testimony that (a) Dunlap and Wise were members of the Goodfellas gang; (b) Dunlap had been released from prison just a few days before his death; (c) the Goodfellas gang is a "hybrid criminal street gang" in Atlanta with approximately 400 members, most of whom are incarcerated; (d) McClendon, who was incarcerated at the time of the incident and is the acting leader of the Goodfellas,

ordered Dunlap's death because of an alleged conflict over a woman; and (e) Dunlap told people that McClendon had placed a hit on him and that people would be at the Nine ready to kill him.

As for what transpired leading up to and during the deadly confrontation, the testimony was conflicting. Taliah Knox, Glover's girlfriend at the time, told the lead detective on the case that Glover was on a speaker phone with Dunlap and Goodfellas-gang-member Darrell McBride while McBride was trying to convince Dunlap to come to the Nine. When Dunlap hung up, McBride told Glover to "take care of business" and Glover said "I got it." At trial, Knox testified that Glover was on the phone with "another male" and that sometime after the phone call, Dunlap arrived at an apartment at the Nine, began arguing with Glover and fellow co-defendant Eric Kendrick, and then pulled out a gun. Glover and Kendrick shot at Dunlap, and Dunlap fled out the back door of the apartment. Once Dunlap was outside, several witnesses, including Knox, observed McBride stand over Dunlap and shoot him in the head. Two gang members, including the victim Wise, told the lead detective that Glover was at the Nine during the shooting but not in the apartment.

Wise also told the lead detective that he was outside the apartment when "Tweezy" (McBride) shot him at the Nine.[1]

We consider first Case No. A18A1409, wherein Glover challenges the denial of his motion for new trial. We consider next Case No. A18A1408, wherein McClendon challenges the denial of his motion for new trial.

### Case No. A18A1409

1. Glover contends that the trial court erred in denying his motion for new trial on the ground that the State failed to disclose evidence of payments made to or on behalf of Knox in violation of *Brady v. Maryland*, 373 U. S. 834 (83 SCt 1194, 10 LE2d 215) (1963). Glover claims that the State's failure to disclose the payments "'undermines confidence in the outcome of the trial [and] creates a reasonable doubt that did not otherwise exist.'" Glover alleges that Knox was the State's star witness, and the only witness to put a gun in his hand and to testify that he was a member of the Goodfellas. According to Glover, Knox's pecuniary interest in testifying for the

---

[1] At trial, Glover's lawyer argued that Knox was lying and that Glover had nothing to do with the shootings; he was in the Nine at the time of the shooting, but not in the apartment. Although the State presented evidence that McClendon had a cellphone in prison, McClendon's lawyer argued that he could not have participated in any way because he is serving a life sentence in prison.

State was unquestionably material and he was entitled to expose this bias to the jury. We agree.

*Background Facts*

At a joint hearing on Glover and McClendon's respective motions for new trial, an investigator with the Atlanta Police Department's ("APD") gang unit testified that Knox was a paid confidential informant. The investigator stated that he began working with Knox in January 2013, when she provided information on members of the "Nine Trey Billy Badass Club" who were causing problems in the Allen Hills area of Atlanta. The investigator confirmed that Knox told him about a murder in Allen Hills and another murder connected to the Goodfellas,[2] and that he passed along Knox's information to the homicide unit, including the lead detective in this case. The investigator also testified that Knox signed a confidential source agreement on February 4, 2014, and that APD twice paid her $60 for information she provided on the Goodfellas and "Delmar Lane," as well as Allen Hills and a tax fraud ring. The investigator testified that Knox stopped working for him after the two payments, and

_____

[2] The investigator testified that he was not sure if Knox was talking about Dunlap's murder.

began working for the lead detective in this case. At one point, Knox told the investigator that she "need[ed] to get her an office and get on the payroll at APD."

There was also evidence presented during the motion for new trial hearing that the Fulton County District Attorney's Office paid a total of $6,421.63 in witness expenses on behalf of Knox during the trial at issue, including a one and a half month hotel stay, per diem expenses, as well as the security deposit on a new apartment, moving expenses, and rent for the first month in that apartment. The prosecutor testified that Knox was in a hotel "for her safety." He believed that he had discussed with Glover's attorney that Knox was afraid for her safety and that she was in a hotel, but he was not sure. The prosecutor was not personally aware that Knox was a paid confidential informant and testified that no one at the police department ever told him that she had been paid for information.

According to Glover's trial attorney, the State never told him that Knox was a paid confidential informant or that she was provided "financial assistance" during the trial. Prior to trial, counsel specifically requested such information as follows:

> [Glover] seeks all of the following information and relief: . . . Any and all consideration or promises of consideration given to or made on behalf of the witnesses called to testify on behalf of the State. By "consideration" the Defendant refers to absolutely anything o[f] value

or use, including but not limited to immunity grants, promises, assurances, bonding accommodations, witness fees, special witness fees, transportation, . . . and anything else which could arguably create an interest or bias in the witness in favor of the state or against the Defense or acts as an inducement to testify or to color testimony.

Counsel never received "anything [from the State] in direct response to that paragraph."[3]

During the motion for new trial hearing, Glover's appellate counsel explained that he discovered Knox had been paid when the issue was raised during an unrelated murder trial involving defendant Jamal Chandler, which occurred in the summer of 2016, more than a year after the trial in this case.[4] In the Chandler case, defense counsel had asked for information about whether Knox was paid as a confidential

_____

[3] McClendon's trial counsel was on medical leave at the time of the motion for new trial hearing and unable to testify. In lieu of his testimony, appellate counsel and the State stipulated to the fact that trial counsel would have questioned Knox about the payments and requested a jury charge in that regard. McClendon also opted into reciprocal discovery, and appellate counsel pointed out during the motion for new trial hearing that there was nothing about the payments to Knox in the discovery provided to McClendon by the State.

[4] On May 26, 2016, Knox testified in the Chandler trial that during the instant case involving McClendon and Glover, she was placed in a hotel and moved out of her apartment because she was being threatened.

informant and "was told documents didn't exist." Around November 20, 2015, defense counsel in the Chandler case learned that APD had in fact paid Knox, and the trial court in that case ordered the District Attorney's Office and APD to produce the documents for an in camera review by the court. The State finally produced the documents one year after they were requested and only after defense counsel filed a motion for contempt, which came on for a hearing in March 2016. Appellate counsel in this case further explained that after learning of the payments to Knox, he filed an open records request, which went unanswered. When he threatened to file a motion to compel, the State produced the records.

*Brady Analysis*

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U. S. at 87.

> The prosecution must disclose evidence in its possession that is favorable to the defendant because the *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but is required to

disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

(Citation and punctuation omitted.) *Schofield v. Palmer*, 279 Ga. 848, 851-852 (2) (621 SE2d 726) (2005). Impeachment evidence falls within the *Brady* rule, and includes evidence of "any deals or agreements between the State and [a] witness." Id. at 852 (2). See *United States v. Bagley*, 473 U. S. 667, 676 (105 SCt 3375, 87 LE2d 481) (1985) (*Brady* extends not only to exculpatory evidence but also to "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest"); *Giglio v. United States*, 405 U. S. 150 (92 SCt 763, 31 LE2d 104) (1972). In *Giglio*, the Supreme Court ordered a new trial after the prosecution failed to inform the defense about its agreement with a witness who testified in exchange for a promise from the government that he would not be prosecuted. 405 U. S. at 154-155. The Court found that where "the Government's case depended almost entirely" on that witness, the prosecution was required to inform the defense about its agreement with the witness because "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury was entitled to know of it." Id. at 154-155.

To prevail on a *Brady* claim, the defendant must show that

(1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

(Citations omitted.) Id. The suppression of impeachment evidence is "material" when a reasonable probability exists "that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U. S. 263, 289 (IV) (119 SCt 1936, 144 LE2d 286) (1999). For purposes of determining reasonable probability, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U. S. 419, 434 (III) (115 SCt 1555, 131 LE2d 490) (1995). See also *Turner v. United States*, 137 SCt 1885, 1893 (II) (A) (198 LE2d 443) (2017) ("[a] reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial") (citation and punctuation omitted). We consider the trial court's *Brady* ruling under a de novo standard. See *State v. James*, 292 Ga. 440, 441 (1) (738 SE2d 601) (2013).

10

In *Schofield*, under factually similar circumstances, our Supreme Court affirmed vacation of the defendant's murder convictions due to *Brady* error, finding that a $500 payment made by the Georgia Bureau of Investigation to a confidential informant who implicated the defendant in the murders was material. 279 Ga. at 851 (1), 853 (3). The Court noted that

> [a]lthough there is a considerable amount of evidence incriminating [defendant] in the murders apart from [the confidential informant]'s testimony, we affirm the habeas court's finding of materiality and its granting of the writ due to *Brady* error. We cannot countenance the deliberate suppression by the State of a payment to a key witness, and its attendant corruption of the truth-seeking process, in any case, and especially in a death penalty case.

Id. at 853 (3). Citing *Kyles*, supra, the *Schofield* Court recognized that a defendant "does not have to show that he would have been acquitted if he had been able to impeach [the witness] with his financial motive for testifying against him; he simply must show that the State's evidentiary suppression *undermines confidence in the outcome of the trial*." (Citation and punctuation omitted; emphasis supplied.) *Schofield*, 279 Ga. at 852-853 (3).

11

The State only contests the materiality of the undisclosed evidence.[5] The State argues that there is no reasonable likelihood of a more favorable outcome at trial because Knox already had been "impeached by memory issues, prior inconsistent statements, and evidence that she claimed wasn't even there." The State further contends that the omitted evidence does nothing to impeach Wise's identification of Glover as his shooter.

In denying the motions for new trial on this issue, the trial court distinguished this case from *Schofield*, finding no evidence of obstruction in obtaining the evidence, and ruling that

> even if . . . Knox's entire testimony were struck, the jury could still have convicted [defendants] of the crime of participation in criminal street gang activities. . . . Furthermore, obtaining that evidence would have done nothing to challenge the evidence from the State's other witnesses. In short, there exists no reasonable probability that the disclosure of this evidence would have affected the outcome of the trial.

---

[5] The State argues that the witness protection and relocation expenses paid to Knox are not *Brady* material. But, because there is evidence that the State paid Knox as a confidential informant, we need not decide whether these additional payments are "*Brady* material." See *Schofield*, 279 Ga. at 851 (1) (State's failure to disclose to defendant GBI payment of $500 to confidential informant violated *Brady* rule).

We do not agree with this conclusion and find that the trial court erred in not granting Glover's motion for new trial on this ground.

Knox was the only witness who identified Glover as a member of the Goodfellas and testified about his involvement in the shooting of Dunlap at the Nine.[6] Contrary to the State's assertion, Wise did not identify Glover as his shooter. According to the lead detective, Wise picked Glover out of a photo lineup and told her that Glover "was in the Nine, . . . but not at the apartment during the shooting" and that Tony Walton, a member of the Goodfellas walked off with Glover before the shooting. Wise told the detective that Rodrecus Strickland "was one of the shooters with Tweezy." On cross-examination, the detective confirmed that Wise told her that

---

[6] At trial, Knox testified that Glover was affiliated with the Goodfellas and known as "Don Geezy." When asked how she knew Glover was affiliated with the Goodfellas, Knox explained: "It's tattooed on the man. We've had several discussions, and I know that from seeing him around them[, i.e., other gang members]." A gang expert was the only other witness to testify about Glover's affiliation with the Goodfellas, and he confirmed that Glover was not in his "gang database" prior to his arrest in this case. The expert testified that Glover has never been verified as a gang member; rather he is a "suspected member" as a result of his arrest in this case. The expert could not identify any Goodfellas tattoos on Glover. In explaining how he monitors gang activity, the expert testified that he monitors social media sites, including YouTube, Facebook, Instagram, and Vine. When he viewed Glover's Vine account, he saw the "moniker, Don Geezy, VL. . . . 'Mob Life or No Life.'" "VL" stands for Viking Life, which is another hybrid gang predominantly engaged in narcotics trafficking. The gang expert testified that Goodfellas members would hang out with other Goodfellas members and Viking Life members.

13

Glover was not in the apartment during the shooting and that another individual left with Glover before the shooting.

Given that Knox was the only witness to connect Glover to the Goodfellas and the shootings, we agree with Glover that her pecuniary interest was material to his defense and that the State's suppression of this evidence undermined confidence in the outcome of the trial. See *Schofield*, 279 Ga. at 853 (3) (affirming habeas court's finding that suppressed evidence that confidential informant had been paid for information "was material because it deprived [the defendant] from impeaching [the informant] with an age-old, logical, pecuniary argument that he had a motive to lie when he provided key testimony that corroborated the testimony of [the defendant's] alleged accomplice") (punctuation omitted). Thus, the trial court erred in denying Glover's motion for new trial based on this *Brady* violation. See *Jackson v. State*, 309 Ga. App. 796, 803 (7) (714 SE2d 584) (2011), citing *Gonnella v. State*, 286 Ga. 211, 215-216 (2) (686 SE2d 644) (2009).

2. Because we have determined in Division 1 that Glover is entitled to a new trial, we need not decide if the trial court erred by rejecting his claim that the State exercised its peremptory strikes in a racially discriminatory manner during jury selection. See *Batson*, supra.

14

3. McClendon also contends that the trial court erred in denying his motion for new trial on the ground that the State failed to disclose evidence of payments made to or on behalf of Knox in violation of *Brady*. McClendon claims that if the jury knew about these payments, there is a reasonable probability he would have been acquitted of the sole charge for which the jury found him guilty.

*Additional Facts Developed at Trial*

While we agree with McClendon that he is entitled to a new trial, we also recognize that his case presents differently than Glover's case as there were a number of witnesses at trial who identified McClendon as a member of the Goodfellas gang. An expert in criminal street gangs testified that McClendon was validated as a gang member in 2011, two years before the incident at issue, and that he has a "GF" tattoo underneath his right eye, which is a very common tattoo seen on members of the Goodfellas gang. The expert also testified that in terms of hierarchy, McClendon is one of the two "popes" in the gang, immediately underneath the "godfather," or leader, of the Goodfellas gang, Abdullah Williamson. The lead detective testified that McClendon's texts included people calling him "pope" as well as McClendon giving instructions to McBride "on how to go about doing things." Dunlap's girlfriend also

15

testified that she knew McClendon to be associated with the Goodfellas. Finally, the lead detective testified that the victim Wise, and gang members Favors and Lowe, each gave oral statements indicating that Dunlap had told them that McClendon had ordered a "hit" on him from prison and that people would be at the Nine ready to kill him.[7] A police report memorializing a verbal statement that Favors gave to police was published to the jury as follows:

> When Dunlap came home [from prison], it was already understood that something was to happen to him on orders from McClendon. . . . It was a power thing and Dunlap never listened to McClendon. . . . Dunlap told Favors while they were both still in prison that he knew there was a hit on him that McClendon had ordered. Dunlap told Favors that people would be waiting for him in the Nine. . . . McClendon said that he was going . . . to have the hit done. [Favors] told Dunlap not to go over there because he knew that Darrell McBride was going to kill him. . . . Favors

---

[7] Favors testified that he knows "J5," a/k/a McClendon, from jail as a "cordial friend" and that Dunlap and McClendon knew each other. Favors explained that Dunlap thought "that harm was coming his way," but Dunlap never told Favors he was worried McClendon was going to get him. Lowe denied knowing McClendon and did not know if Dunlap was in the Goodfellas gang. When asked if he recalled giving a statement to the lead detective, Lowe responded, "[y]eah." He then clarified that most of the statement was lies and that he did not "make those statements." A video of his statement was played for the jury. Lowe explained that he was threatened to make the statement. He also testified that he did not know McClendon. Wise also testified that he did not know McClendon, that he had ever been to the Nine, and that he never gave a statement to police.

16

said that he heard both McBride and Walton were the shooters. . . . Favors said he is in fear for his life because his mother's house was shot up.[8]

Favors also told the lead detective that McBride, "a capo in Goodfellas," was "stamped in," or initiated into the gang, by McClendon, and both Wise and Lowe identified McBride as the individual who shot Dunlap in the head at the Nine.

*Brady Analysis*

As in Case No. A18A1409, the State only contests the materiality of the undisclosed evidence. According to McClendon, the evidence was material under *Brady* because it would have shown that Knox was motivated by bias and had a possible motive to lie. In McClendon's opinion, Knox was the State's key witness, "with [the] theory of the case of the shooting death of the victim hanging on her testimony. . . [She] was [also] the most reliable and credible of the State's lay witnesses[, and] identified [McClendon] as being in a gang, the only charge of which

_____

[8] At trial, Favors denied meeting with the lead detective or making this statement, and he denied knowing anyone affiliated with the Goodfellas, but knew that Dunlap was in the Goodfellas. He testified that he was not aware of McClendon "ordering anybody to hurt anybody" and confirmed that he was not present when Dunlap was killed.

17

he was convicted."[9] It is important to note that McClendon was not convicted for

---

[9] This argument somewhat misrepresents Knox's testimony in that she never identified McClendon at trial as being a member of the Goodfellas gang. The only evidence that Knox ever identified McClendon came during the following colloquy between the State and the lead detective:

> [Detective]: These are the photographs that I showed, or a copy of photographs that I showed to Ms. Knox.
> [State]: And why did you present these photographs to her?
> [Detective]: I wanted to know if she was telling me the truth that she actually knew gang members, and particularly this guy.
> [State]: And what happened when you showed her these photos?
> [Detective]: She began picking people out. She knew them as known Goodfellas members, and she was able to give me the names.
> [State]: I'm going to show you State's Exhibit 189. Who is this person?
> [Detective]: That's Joshua Favors, also know as Machiavelli.
> [State]: Who is that individual?
> [Detective]: Rodrecus Strickland, also known as Don 2Love.
> [State]: Who is this one; this is 183? . . .
> [Detective]: This is Mautious Wise. . . .
> [State]: And that's [State's Exhibit] 183?
> [Detective]: Yes.
> [State]: 182?
> [Detective]: This is [co-defendant] Eric Kendrick, also known as E.I.
> [State]: 181?
> [Detective]: Georgio Glover also known as Don Geezy. This is Johnny McClendon, also known as 5.
> [Defense Counsel]: We would object. And, Judge, may we approach?
> The Court: Yes, sir. (A conference was held at the bench between counsel and the court, not reported.) . . .
> [State]: If you can please select the photographs out of this group that Ms. Knox was able to identify, which numbers was she able to identify?
> [Detective]: She positively identified State's Exhibit No. 194 . . . 187, 185, 182, 181, 184; I believe she did 183. . . .
> [State]: And with respect to 189, did she know that individual?

18

"being in a gang," but rather for participation in criminal street gang activity through the commission of one of the following enumerated offenses: murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.

---

[Detective]: I don't believe so. I can't remember right off the top of my head.
[State]: State's 194?
[Detective]: Yes.
[State]: Who is that individual?
[Detective]: Terrell McBride.
[State]: State's 187, who is that individual?
[Detective]: Forgive me. I may say his name wrong, Quiyontay Sanders, also known as Midnight.
[State]: State's 185?
[Detective]: That's Rodrecus Strickland, a/k/a Don 2Love.
[State]: State's 182?
[Detective]: E.I. Eric Kendrick, I'm sorry.
[State]: State's 181?
[Detective]: Georgio Glover, Don Geezy.
[State]: And then State's 183?
[Detective]: Boo Roc, Mautious Wise.

It is not clear why McClendon's trial counsel objected when the detective testified about Knox's identification of McClendon, but the State did not ask the detective later in that colloquy to identify State's Exhibit 184, and Knox herself never identified or mentioned McClendon during her testimony. In fact, when asked at trial if she recognized State's Exhibit 184, Knox said "No." Earlier in the trial, the criminal street gang expert had identified State's Exhibit 184 as a photograph of McClendon. Regardless, the fact that Knox never identified McClendon at trial as a gang member does not change our analysis.

19

As discussed in Division 1, supra, impeachment evidence must be material before its suppression justifies a new trial. See *Brady*, 373 U. S. at 87. The suppression of impeachment evidence is "material" when a reasonable probability exists "that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U. S. at 289 (IV). A "reasonable probability" exists if the State's suppression undermines confidence in the verdict. See *Schofield*, 279 Ga. at 852-853 (3). See also *Kyles*, 514 U. S. at 434 (III). We are required to evaluate the strength of the impeachment evidence and the effect of its suppression "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Bagley*, 473 U. S. at 683 (III) (A).

In this case, we find that the State's suppression of payments made to Knox for her information, viewed in the context of the entire record, undermines confidence in the outcome and overall fairness of McClendon's trial. The State's evidence regarding the enumerated offenses for McClendon's conviction for participation in criminal street gang activity hinged in large part on the credibility of Knox, and McClendon was not given the opportunity to fully examine that credibility. The

20

Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal case the opportunity to cross-examine a witness for the direct purpose of revealing possible biases, prejudices, or ulterior motives of the witness. See *Davis v. Alaska*, 415 U. S. 308, 315-317 (94 SCt 1105, 39 LE2d 347) (1974). In fact, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination"; and, is "always relevant" in "discrediting the witness and affecting the weight of the testimony." (Citations and punctuation omitted.) Id. at 316. As our Supreme Court has noted, whether or not the witness has a deal with the State is not crucial; rather,

> [w]hat counts is whether the witness may be shading his testimony in an effort to please the prosecution. A desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the [S]tate nevertheless may cloud perception.

(Citations and punctuation omitted.) *Hines v. State*, 249 Ga. 257, 260 (2) (290 SE2d 911) (1982). Exposure of a witness' motivation is even more critical if the witness is a confidential informant as it has long been recognized that informers pose "serious questions of credibility." (Citation and punctuation omitted.) *Banks v. Dretke*, 540 U.

21

S. 668, 699-703 (II) (C) (124 SCt 1256, 157 LE2d 1166) (2004) (State violated *Brady* when it failed to disclose evidence that witness had been paid for his information).

The State argues that there is no reasonable likelihood of a more favorable outcome at trial because Knox already had been "impeached by memory issues, prior inconsistent statements, and evidence that she claimed wasn't even there." But, Knox was never cross-examined or impeached as to her bias or "ulterior motives" for testifying. Knox's testimony was the glue that held the State's case together; while she never identified McClendon during trial or connected him to the Goodfellas or the shootings of Dunlap and Wise, her testimony was crucial to the State in establishing the details immediately preceding the shootings of both victims. The State even emphasized the importance of Knox's testimony during closing argument as follows:

> Again, Glover, Kendrick, directly participating. You heard from Taliah Knox. She told you unequivocally, Georgio Glover had a gun in his hand, shot him. And then Eric Kendrick, who she identified, shot him again. They lured him over there. She told you about the phone calls: intentionally advises, encourages, hires. McClendon ordering the murder from Georgia State Prison. . . . Taliah Knox is the only person that has the courage to come and say these guys did it. Nobody else in that neighborhood is going to come in and say a word because they are terrified of these individuals, terrified, with damn good reason.

22

As the Supreme Court observed in *Kyles*, "[t]he likely damage [of suppressed evidence] is best understood by taking the word of the prosecutor[.]" 514 U. S. at 444 (IV) (A).

The pivotal question "is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453 (IV) (D). In this vein, we reiterate that the standard is not whether there is sufficient evidence for conviction, but whether there is a "reasonable probability" that the outcome would have been different, meaning that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435 (III). Here, that standard is met. The impeaching evidence was strong enough to cast doubt over Knox's testimony. While several people told the lead detective that McClendon had placed a hit on Dunlap, only Knox insinuated that Glover and McBride lured Dunlap to the Nine, presumably at McClendon's direction. Moreover, all but one witness who implicated McClendon in the hit denied at trial giving statements to the lead detective, and that witness testified that he had been threatened. And, Dunlap's girlfriend testified that Dunlap told her somebody was trying to kill him, but Dunlap never told her who. Given these circumstances, it is

highly probable that Knox's testimony influenced the jury and it is reasonably probable that the jury, if made aware of the impeaching evidence, would have given less credence to Knox's testimony or viewed her version of events with a great deal more suspicion, and would have returned a different verdict. Moreover, she corroborated the lead detective's critical testimony. Knowledge that the State paid Knox might have lead the jury to question the credibility of the lead detective if it also questioned Knox's credibility and corroboration of the detective's version of events. Because Knox was the key witness in the case, *any* evidence impacting her credibility or bias was relevant and material, and should have been disclosed to defense counsel prior to trial and the trial court erred in ruling otherwise. See, e.g., *Schofield*, 279 Ga. at 853 (3).

4. Because we have determined in Division 3 that McClendon is entitled to a new trial, we need not decide if the trial court erred by rejecting his claim that the State exercised its peremptory strikes in a racially discriminatory manner during jury selection. See *Batson*, supra.

*Judgment reversed in Case No. A18A1408 and Case No. A18A1409. Miller, P. J., and Goss, J., concur*.