COURT OF APPEALS
DECISION
DATED AND FILED

October 2, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2017AP2049-CR**

Cir. Ct. No. 2013CF402

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

SCOTT L. NUTTING,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Fond du Lac County: RICHARD J. NUSS, Judge. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶1    NEUBAUER, C.J.  Scott L. Nutting appeals from a judgment of conviction for second-degree sexual assault of a child and an order denying his postconviction motion for relief.  Nutting seeks a new trial on the ground that the trial court record does not reflect which portions of an audio custodial interview of

him were played to the jury. We conclude that the circuit court was able to sufficiently reconstruct what was played to the jury and did not err in determining that nothing prejudicial was played. Because we conclude that Nutting was not denied his right to a meaningful appeal and we reject his other challenges, we affirm.

## BACKGROUND

*The Background Facts and Charges*

¶2    In December 2011, Nutting met, via a website, P.K., who claimed that she was eighteen but was actually fourteen. Nutting picked up P.K. from her home and drove her to a Fond du Lac motel. Nutting claimed that, once she said she was only fourteen, he told her to get out of his car, they never went into the motel, and the last time he saw her she was walking across the parking lot. He denied ever having sexual contact with her.

¶3    P.K. asserted that they went into the motel room and had sex for three hours. Evidence showed that P.K. told him that she was fourteen.

¶4    In June 2013, Nutting was charged with one count of second-degree sexual assault of a child, with a repeater enhancer based on his past conviction for attempting to possess child pornography.

¶5    During the investigation, Detective Brian Bartelt conducted a custodial interview of Nutting, which was recorded. The recording was over an hour long. As explained later, most, but not all, of the recording was played to the jury.

¶6     During the interview, Nutting also offered to take a lie detector test, which was not given.

*The Trial*

¶7     On the first day of trial, the court and parties reviewed the matter of the audio recording.  Nutting's counsel, Timothy Hogan, noted that if the State were to play the entire interview, they would need to "redact[] the portions that are overly prejudicial to Mr. Nutting," and the court should require the State to play the portion where Nutting offered to take a polygraph.

¶8     The court asked whether the parties agreed about which portions would be redacted.  Hogan responded that before trial he and the State "discussed redacting portions [in which] Mr. Nutting indicated he was in custody and [mentioned] some of his prior convictions."

¶9     Prior to the second day of trial, Hogan indicated concern that playing the beginning of the recording with references to *Miranda*[1] could alert the jury that Nutting was in custody at the time of the statement and that fact would be prejudicial.  That issue was generally resolved.

¶10    Counsel for the State explained it would redact at least two sections of the interview.  He stated that he would read into the record the relevant time frames that were played.

¶11    During a break in front of the jury, the following exchange took place as they were setting up the recording:

---

[1]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

> [THE STATE]: It's my intent with the agreement of Mr. Hogan to play the majority of the recorded interview that took place between Bartelt and Mr. Nutting. I just need a minute or two to set that up. It's a little— It's right about an hour.
>
> [THE COURT]: Okay. Why don't we try to make that work. He's going to need about ten minutes to set it up. Why don't we do that before lunch.
>
> I think in the recording as I understand it, not to steal anybody's thunder here, but there might be some—a couple portions that quite frankly are unrelated issues, have nothing to do with anything, so we're jumping by that. And so if you happen to sense that there's a break or there's a pause or we're doing something, that's the reason for that.

¶12    The State called Bartelt, who testified Nutting stated that he told P.K. to get out of his car once she told him she was fourteen and he never had sexual intercourse with her, while P.K. stated they had sex in the motel room for three hours.

¶13    After Bartelt testified, the State played what he described as the "majority of" the audio recording of Bartelt's interview with Nutting. No transcription or other record was made of which portions were played for the jury. The State, defense counsel, and court did not notice the omission.

¶14    The jury found Nutting guilty of second-degree sexual assault of a child.

*Postconviction Motion and Hearing*

¶15    Nutting moved for postconviction relief. He asserted his trial counsel was ineffective in failing to have the recording excluded or, in the

alternative, the circuit court erred in failing to ensure that the recording complied with SCR 71.01(2)(e) (2019) and related statutes.[2]

¶16　Nutting further argued that the prosecution violated ***Brady v. Maryland***, 373 U.S. 83 (1963), when it failed to turn over P.K.'s October 2013 victim impact statement from another case in which P.K.'s mother, S.K., pleaded no contest to failure to protect a child. According to the complaint in that case, P.K. told S.K. in June 2013 that she was going to have sex in her home with two men; S.K. told P.K. that she should "just not get pregnant." In the victim-impact statement, P.K. wrote, "I [P.K.] do not listen to my mother and she tryed (sic) to stop me. [A]nd she did not do anything wrong. [I]t was all me." When prompted for her view on sentencing, P.K. asked for probation: "she is a good mother and I am the one that mass (sic) up by lieing (sic), and talking to old men when I was told not to. So I am asking just for probation that is it."

¶17　Nutting also sought a new trial in the interest of justice.

¶18　In support of his challenge based on the audio recording, Nutting identified several portions that were arguably prejudicial and that, if they were played to the jury, could support a claim that counsel was ineffective for failing to object or seek exclusion. Those statements included:

---

[2] In the postconviction motion, Nutting had also asserted his trial counsel was ineffective for failing to fully investigate the case and, in particular, by failing to obtain testing of a sexual assault nurse examination kit and underwear collected from P.K. Relatedly, Nutting sought DNA testing of the kit and underwear. Additional testing occurred, and Nutting does not raise the DNA issue on appeal.

(1) Nutting indicates he was in prison for forty-three months for two cases, two years for theft, two years for attempted possession of child pornography, and he is now on parole;

(2) Nutting states, "I had just got done doing 43 months in prison for something that I did not do. Okay. I never sat down and searched for child porn. I never looked at it" and "I'm telling the truth now again. I already know what is going to happen. I'm going to go right up the damn river this time and I did nothing this time. I did it the right way."

(3) Nutting refers to his "sex offender rules" and that he is not allowed to have sex unless approved by an agent, also acknowledging that having placed profile pictures on a website was probably a probationary violation; and

(4) Nutting states, "Because I'm already a sex offender, so my credibility is just shot. You know, I'm just a—I'm just a piece of shit, you know, I'm just a pedophile. I'm—that's a fear that I have when people look at me because of my track record, you know."

¶19    In an effort to reconstruct the recording played to the jury, the court held an evidentiary hearing at which Nutting's trial counsel, Hogan, testified. Hogan testified that he reviewed the audio recording in his trial preparation, he discussed the recording with the State, and they agreed in principle as to which portions of the recording would be played and which would not.

¶20    The State then offered as an exhibit its note sheet reflecting the redacted portions of the audio recording. When first asked if he was familiar with it, Hogan testified, "I know I've seen it.... I remember you had a sheet of paper

and it had some numbers on it, I don't recall if this was it or not." But Hogan agreed that the State's note sheet had the following notations:

> 1:00 - 5:35
>
> 25:00 - 26:20
>
> 33:40 - 35:00
>
> 1:05:49
>
> When to Stop

Those notations reflect time spans during which the potentially prejudicial comments were made, except for the portion where Nutting referenced child pornography and having served forty-three months, which was at the fifteen minute mark.

¶21 Hogan further elaborated on his discussions with the State. He compared his notes of portions to be redacted against the State's, and remembered seeing the State's notes about start and stop times. "I remember comparing them to the specific time notations in [my notes] to make sure that the points that I specifically knew were improper" matched with the notes for those portions that would not be played.

¶22 Hogan's notes identify the initial portion of the interview in which Nutting discusses custody in prison and his prior convictions. Hogan testified that he did not take notes of it "at later parts of the interview."

¶23 Hogan further testified that he listened to the recording when it was played at trial and did not hear any objectionable material played to the jury. He testified that he would have objected if he had heard objectionable material.

> [THE STATE]: … Had you heard any portions of the
> audio recording that you felt were either overly prejudicial

or were completely inadmissible would you have objected at trial?

[COUNSEL]: Objection.

[THE COURT]: Overruled.

[HOGAN]: Would I have objected to pieces of the recording that I believed were improper?

[THE STATE]: Yes.

[HOGAN]: Yes.

….

[THE STATE]: You felt that the portions that—as you and I discussed what portions were to be played, that I was being more restrictive as to the content that was going to be played for the jury than your initial concerns were about the actual content of the recording?

[HOGAN]: Yes.

¶24 Hogan agreed that serving forty-three months and referencing child pornography were prejudicial, he would have sought exclusion of those statements, and he had no specific recollection as to whether those statements had been played to the jury. But Hogan made clear, "had I heard any information that would have been improper I believe I would have objected to it or made a record that, hey, this portion was played to the jury and I think it was improper." And he confirmed that at trial, he "didn't take any notes of any statements being admitted that [he] found to be improper."

¶25 The presiding circuit court was certain that the jury heard no unduly prejudicial remarks from the recording. At the initial hearing on the motion on September 30, 2016, the court noted that it read Nutting's postconviction counsel's motion. The court stated: "I presided over this trial, I know what the

record is.… And I'm going to tell you flat out there wasn't one of those statements that ever came in on the record. None."

¶26 At the later evidentiary hearing in February 2017, the court ratified its earlier certainty of whether prejudicial comments from the recording were played to the jury while he guided the trial: "I presided over this [trial] and I was the judge and as I indicated previously I'll reaffirm now that there was nothing prejudicial that was addressed."

¶27 The circuit court denied the motion in a written decision and order. At the outset, the court "accept[ed] responsibility for failing to note on the record those parts of the audio recording of the Defendant's interview that were played to the jury." It did not make findings as to the exact start and stop times of the redacted or played material. Rather, it determined that nothing prejudicial to Nutting was played to the jury: "[T]he testimony of Attorney Hogan, coupled with the applicable Exhibits, unequivocally establishes those limited portions [of the recording] played to the jury and clearly demonstrates the absence of any objectionable or prejudicial statements being played."[3]

¶28 The court held that the State did not violate **Brady** when it did not provide Hogan "with a copy of P.K.'s victim impact statement from a completely non-related case."

---

[3] Although the court opined that "[t]his omission, given the trial record, and the compelling and persuasive DNA evidence, should be considered harmless error should any be determined," the DNA evidence, for a variety of reasons, was never introduced into evidence and considered by the jury.

¶29    Finally, the court held that Nutting failed to demonstrate entitlement to a new trial based on ineffective assistance or in the interest of justice because "[t]here is just no basis to support any claim that a new trial would produce any different result."

¶30    Nutting appeals.

## DISCUSSION

*The Law of an Appellate Record and the Standards of Review*

¶31    Although Nutting argues the circuit court erred by failing to ensure that the audio recording was "precisely identified in the record" and therefore out of compliance with SCR 71.01(2)(e),[4] we take this to be a claim alleging a deprivation of a meaningful appeal. The right to appeal is absolute under the Wisconsin Constitution. WIS. CONST. art. I, § 21(1); ***State v. Perry***, 136 Wis. 2d 92, 98, 401 N.W.2d 748 (1987). As part of that right, a defendant must be provided "a full transcript—or a functionally equivalent substitute that, in a criminal case, beyond a reasonable doubt, portrays in a way that is meaningful to the particular appeal exactly what happened in the course of trial." ***Perry***, 136

---

[4] SUPREME CT. RULE 71.01(2)(e) provides as follows:

> Audio and audiovisual recordings of any type, if not submitted under [SCR 71.02 (d)], that are played during the proceeding, marked as an exhibit, and offered into evidence. If only part of the recording is played in court, the part played shall be precisely identified in the record. The court may direct a party or the court reporter to prepare the transcript of a recording submitted under this paragraph.

A number of revisions with respect to stenographic reporters and related procedures took effect as of July 1, 2019, none of which affect the above-quoted provision. S. Ct. Order 19-01, 2019 WI 5 (eff. July 1, 2019).

Wis. 2d at 99. If a deficiency in the transcript deprives a defendant of a meaningful appeal, the remedy is a new trial. *Id.*

¶32 But a new trial is only called for if the defendant can show a "colorable need," i.e., "an error which, were there evidence of it revealed in the transcript, might lend color to a claim of prejudicial error." *Id.* at 101 (citation omitted). The State concedes that a "colorable need" existed for clarification of which portions were redacted—as there were multiple statements in the audio recording that, if played to the jury, few would dispute are prejudicial.

*The Record Was Sufficiently Reconstructed and No Prejudice Resulted*

¶33 Having shown a colorable need, we must look to see whether the circuit court could adequately reconstruct the record. *See State v. Raflik*, 2001 WI 129, ¶¶35-36, 248 Wis. 2d 593, 636 N.W.2d 690. We have stated that, when disputes about the record remain, those disputes will be settled by the circuit court, relying on its own recollection and notes or materials from the parties as an aid to reconstruction. *Id.*, ¶36. To this end, the court may also conduct hearings and consult with counsel. *Id.* The court's "duty is to establish what the [missing] testimony was," not to "speculate about what the testimony probably was or might have been." *State v. DeLeon*, 127 Wis. 2d 74, 81, 377 N.W.2d 635 (Ct. App. 1985). In a criminal trial, the circuit court must be satisfied beyond a reasonable doubt that the State met its burden of proof in establishing that the missing testimony could be properly reconstructed. *Id.* at 82.

¶34 "Every step of this procedure is reviewable on appeal, and appellate courts should review errors in the reconstruction itself under the 'clearly erroneous' standard." *Raflik*, 248 Wis. 2d 593, ¶36 (citation omitted). But

whether reconstruction of the trial court record is adequate is a question of law reviewed de novo. *Perry*, 136 Wis. 2d at 97.

¶35   Here, the circuit court was able to reconstruct the record and its factual conclusion that no prejudicial portions were played is not clearly erroneous. The defect or problem was not missing exhibits, a corrupted disk drive, or, as faced by our supreme court in *Perry*, lost-in-the-mail court reporter notes, which, once found, "were incomplete and in a jambled mess," ultimately leaving one-eighth of the proceedings missing, including the entire testimony of two witnesses, all closing arguments, and other documentary fragments. *See id.* at 95-96, 107.

¶36   Rather, we actually possess the intact evidence—Nutting's audio recording. When the evidence is fully available, multiple witnesses can speak to the issue, and contemporaneous notes or exhibits help to corroborate what was played and what was not, the circumstances are highly favorable for a sufficiently reconstructed record.

¶37   Hogan testified that he understood Nutting's statements regarding prison time and that prior convictions would be prejudicial. He identified these topics in his notes. Hogan agreed with the State in principle on what was to be redacted, and they then compared notes and confirmed that the agreed-upon portions would be redacted. The State's notes were introduced at the evidentiary hearing, identifying all but one of the agreed-upon portions. However, this portion contained the topics—custody in prison and prior convictions—that they had agreed would be redacted. Indeed, Hogan listened at trial and did not hear any objectionable portions, he would have objected had they been played, and he had

12

no notes indicating that objectionable portions were played. The circuit court confirmed, based on its own recollection, that no prejudicial portions were played.

¶38 Using the clearly erroneous standard, we conclude that the circuit court properly determined that the defective record could be reconstructed. *See DeLeon*, 127 Wis. 2d at 81. Both the State and trial counsel were available to reconstruct the record, *see State v. DeFilippo*, 2005 WI App 213, ¶17, 287 Wis. 2d 193, 704 N.W.2d 410 (availability of witnesses), based on their memories and notes, *see id.*, ¶16 (contemporaneous documents), and we see nothing in the testimony that would render the circuit court's conclusion clearly erroneous. Further, the evidence here was not a complex array of witnesses or documents, but rather statements made on an audio recording that were few, simple, and brief, *see id.*, ¶18 (complexity factor), generally reducing the chance of error. Finally, the postconviction court, resolving any doubt, confirmed the veracity of the reconstruction without question, and we cannot find clear error in that determination. *See id.*, ¶13 (circuit court resolves any dispute).

¶39 Based on the foregoing, we conclude that the reconstructed record serves to provide for a meaningful appeal as a matter of law. *See Perry*, 136 Wis. 2d at 97.

*As His Defense Did Not Prejudice Nutting, Hogan's Legal Assistance Was Not Ineffective*

¶40 Nutting also argues that Hogan provided ineffective assistance of counsel for failing to anticipate that Nutting's recorded interview would be played at trial, for failing to object to those parts that were highly prejudicial, and for failing to keep accurate notes of what was played. We reject his claims.

13

¶41 A defendant claiming ineffective assistance of counsel must prove both that the lawyer's representation was deficient and that he or she suffered prejudice as a result of that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the court concludes that the defendant has not proven one prong of this test, it need not address the other. *Id.* at 697. To prove deficient performance, a defendant must show specific acts or omissions of counsel that were "outside the wide range of professionally competent assistance." *Id.* at 690. To show prejudice, the defendant must prove that the alleged defect in counsel's performance "actually had an adverse effect on the defense." *Id.* at 693. More than merely showing that the error had some conceivable effect on the outcome, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Pitsch*, 124 Wis. 2d 628, 642, 369 N.W.2d 711 (1985) (quoting *Strickland*, 466 U.S. at 694).

¶42 Nutting has not shown that Hogan failed to ensure redaction of the prejudicial comments. Even if we assume Hogan's oversight in failing to make a trial court record of what was played was deficient, it was not prejudicial. Discussed above, the court properly determined that no prejudicial comments were heard by the jury, and we affirm that determination. For that reason, Nutting cannot demonstrate prejudice.

14

*The Trial Court Did Not Err by Not Giving a Jury Instruction on Nutting's Offer to Take the Polygraph Test*

¶43    Well before trial, Nutting moved to introduce into evidence his offer during Bartelt's interview that Nutting would take a polygraph test.  He now claims the circuit court erred in failing to instruct the jury that his offer may have been an indicia of innocence.  We disagree.

¶44    Nutting failed to ever propose a jury instruction on this point. During a pretrial hearing, the circuit court expressed skepticism of a request to introduce evidence of an offer to take a polygraph test in terms of its admissibility, and it cautioned Nutting about opening the door to impeachment, but the court deferred ruling on the motion until other evidence was first presented.  Nutting complains about the court's initial comments, but he fails to establish that his motion was addressed and denied.  Whether Nutting's offer was played or not, Nutting does not point out when, if ever, he submitted a proposed instruction.  *See* WIS. STAT. § 805.13(3) (2017-18) (at the close of evidence, counsel may move the court for jury instructions or object to others, and a failure to object is a waiver).

*The Circuit Court Did Not Err in Denying Nutting's **Brady** Challenge*

¶45    Nutting asserts that promptly giving him P.K.'s victim impact statement from the failure to protect case against her mother was particularly important here as the jury's decision, Nutting believes, turned on credibility and nothing else.  The State did not offer surveillance footage, DNA evidence, any witnesses (beyond P.K.), and never nudged Nutting toward a confession. Therefore, the impact statement, which makes P.K. a liar in her own words, was critical.  This was a ***Brady*** violation, Nutting claims.  *See **Brady***, 373 U.S. 83.  We disagree.

¶46    The suppression of evidence favorable to the defendant is a violation of due process. *Id.* at 86.  To the point, a *Brady* violation requires that (1) the State suppressed evidence (2) favorable to the defense and (3) material to the determination of guilt. *State v. Garrity*, 161 Wis. 2d 842, 848, 469 N.W.2d 219 (Ct. App. 1991).

¶47    As noted, in the complaint, P.K. told her mother that she was going to have sex in her home with two men.  In her impact statement, P.K. said that she does not obey her mother, that she takes the blame for what happened to her, that she is dishonest, and talks to older men when told not to.  P.K. had in effect testified to this behavior at trial.  She testified that "she was acting out," not following rules, and abusing alcohol.  The inattention from her mother caused her to seek out older men on internet dating sites, using fake names and claiming to be eighteen.  As a result of her conduct with these men and other issues, she was placed in foster care.

¶48    We fail to see how the redundant, effectively cumulative evidence of the impact statement would be favorable to Nutting.  For *Brady* to apply, the "whole case" has to be put in a different light:  "Prejudice" encompasses *Brady*'s materiality requirement such that the defendant is not prejudiced unless "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *State v. Harris*, 2004 WI 64, ¶15, 272 Wis. 2d 80, 680 N.W.2d 737 (citations omitted).  As a practical matter, if the evidence fails to show a "reasonable probability of a different result," it is not material and falls outside of *Brady*. *Banks v. Dretke*, 540 U.S. 668, 699 (2004) (citation omitted).

16

¶49    As noted, the impact statement was from P.K.'s mother's failure-to-protect case, in which P.K. states she does not obey her mother, she talks to older men when she should not, and ends up messing things up by lying.[5]  It is unlikely the evidence would have been helpful to Nutting.  Indeed, it could cut the other way, pointing up that P.K. goes behind her mother's back and talks to strange men, weakening Nutting's defense by underscoring that the fourteen-year-old P.K. was subject to exploitation.  In any event, the impact statement is cumulative as to her behavior and does not constitute a **Brady** violation.  The information of the statement had no "reasonable probability of [giving Nutting] a different result." *See **Banks***, 540 U.S. at 699.

*The Interests of Justice Do Not Warrant a New Trial*

¶50    Pointing out what he claims are multiple serious errors—the mismanaged recording, the failure to instruct the jury on the polygraph, and the **Brady** violations—Nutting contends that a critical mass of deficiencies can tip the scales and result in enough prejudice to warrant a new trial.  We reject the request outright.  As discussed, the alleged violations are not violations at all and, more to the point, would not have had any appreciable impact on the outcome.  *See **Mentek v. State***, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976) (no new trial because of the lack of substance of defendant's arguments:  "Adding them

---

[5] As part of his **Brady** argument, Nutting alludes to the State's failure to disclose the criminal charge against S.K. for failing to protect a child, and he vaguely asserts that having this information would have been helpful to impeach S.K. because she had a motive to cooperate with the State.  We reject the argument.  In his postconviction motion, Nutting did not develop this barebones argument, effectively depriving the circuit court an opportunity to rule on it. *See **State v. Reese***, 2014 WI App 27, 14 n.2, 353 Wis. 2d 266, 844 N.W.2d 396 (we need not address arguments raised for the first time on appeal); ***State v. Tentoni***, 2015 WI App 77, ¶12, 365 Wis. 2d 211, 871 N.W.2d 285 (we need not address undeveloped arguments).

together [to claim that justice was not served] adds nothing. Zero plus zero equals zero").

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.